PATRICK R. COSTELLO
Florida Bar No. 75034
SECURITIES AND EXCHANGE COMMISSION
100 F Street N.E.
Washington, DC 20549-5985
Telephone: (202) 551-3982
Facsimile: (202) 772-9245
Email: costellop@sec.gov
Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. **'16 CV 0998 CAB DHB** |
| Plaintiff, | |
| vs. | |
| LUKE C. ZOUVAS, CAMERON F. ROBB, CHRISTOPHER D. LARSON, JASON M. SCHIPRETT, and ROBERT D. JORGENSON, | **COMPLAINT** |
| Defendants. | |

Plaintiff Securities and Exchange Commission alleges:

I.    **INTRODUCTION**

1.    The Commission brings this action to enjoin Defendants Luke C. Zouvas ("Zouvas"), Cameron F. Robb ("Robb"), Christopher D. Larson ("Larson"), Jason M. Schiprett ("Schiprett") and Robert D. Jorgenson ("Jorgenson") from violating the antifraud provisions of the federal securities laws.  From no later than December 2011 through at least December 2012, Defendants engaged in a "pump-and-dump" scheme to manipulate the market for the stock of Crown Dynamics Corp. ("Crown"), a publicly-traded shell company.

2.    As part of the scheme, Larson obtained controlling shares of Crown from Asher Z. Zwebner ("Zwebner"), an Israeli accountant who created and secretly controlled the company and its stock.  Although Larson controlled Crown and acted as its *de facto* chief financial officer, his name did not appear in any of Crown's filings with the Commission.  With the assistance of Zouvas, an attorney based in San Diego who served as Crown's general counsel, Larson transferred free-trading Crown shares from Zwebner's nominees – purported shareholders in Crown's initial public offering – to Larson's nominees, including Jorgenson and Schiprett.  Larson then paid $400,000 for a "call center" to promote Crown and placed manipulative trades in his own brokerage account to create the appearance of market interest in the stock.  Robb prepared materially misleading press releases about the company's business success.  As Crown's stock price became inflated as a result of Larson's and Robb's efforts to pump the stock, Larson's nominees Jorgenson and Schiprett sold Crown shares and wired most of the sale proceeds – at least $865,000 – to accounts controlled by Larson.   Jorgenson and Schiprett retained some of the proceeds as compensation for their assistance in the scheme as nominees.

3.    As a result of the conduct alleged in this Complaint, Defendants violated Sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities

Act"), 15 U.S.C. §§ 77(q)(a)(1) and 77(q)(a)(3); and Section 10(b) and Rules 10b-5(a) and 10b-5(c) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and 17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c).  Unless restrained and enjoined, Defendants are reasonably likely to continue to violate the federal securities laws.

## II.   DEFENDANTS AND RELATED ENTITIES AND INDIVIDUALS

### A.   Defendants

4.   Zouvas, age 45, resides in San Diego, California.  He is an attorney licensed to practice law in the State of California.  During the relevant time period, he acted as escrow agent for Larson's purchase of the Crown shell from Zwebner, and as general counsel for Crown.  Zouvas declined to testify in the Commission's investigation based on his Fifth Amendment privilege against self-incrimination.

5.   Robb, age 46, resides in Arizona.  During the relevant time period, he was a business associate of Larson and a co-managing member with Larson of Bull Market Investments, LLC ("Bull Market").  In addition, since August 2013, he has been an officer and director of Mix 1 Life, Inc. ("Mix 1"), a company whose common stock trades on the Over-the-Counter Bulletin Board ("OTCBB").  Robb declined to testify in the Commission's investigation based on his Fifth Amendment privilege against self-incrimination.

6.   Larson, age 44, resides in Arizona. He is a certified public accountant in the State of Minnesota on inactive status.  He became licensed in 1997, but his certificate expired in 2001 and he failed to renew it.  As a result, in 2007, the Minnesota Board of Accountancy censured Larson and imposed other sanctions. During the relevant time period, he acted as *de facto* chief financial officer of Crown, and he and Robb were business associates and co-managing members of Bull Market.  Larson also currently serves as the chief financial officer of Mix 1. Also, as of June 2014, Larson was the chief financial officer and interim chief executive officer of Hondo Minerals Corp. whose common stock trades on the

1   OTCBB.  Larson declined to testify in the Commission's investigation based on his
2   Fifth Amendment privilege against self-incrimination.

3         7.     Schiprett, age 42, resides in Arizona.  During the relevant time period,
4   he acted as Larson's nominee, selling Crown stock and sending the trading
5   proceeds to bank accounts owned by Larson.  Schiprett declined to testify in the
6   Commission's investigation based on his Fifth Amendment privilege against self-
7   incrimination.

8         8.     Jorgenson, age 44, resides in Arizona.   During the relevant time
9   period, he acted as Larson's nominee, selling Crown stock and sending the trading
10  proceeds to bank accounts owned by Larson.  Jorgenson declined to testify in the
11  Commission's investigation based on his Fifth Amendment privilege against self-
12  incrimination.

13       **B.**    **Related Entities and Individuals**

14        9.     During the relevant time period, Crown was a Delaware corporation.
15  On or about September 21, 2010, in its initial public offering registration statement,
16  Crown claimed it planned to develop a patent for a toothbrush.  After its registration
17  became effective, the company's stock began trading under the symbol CDYY and,
18  in January 2012, Crown announced a new product – an electronic monitoring
19  device called PomCom.  During the relevant time period, Crown stock traded in the
20  U.S. on the over-the-counter market, and its IPO shares were issued in the U.S. by a
21  U.S. registered transfer agent.  U.S. investors purchased and sold shares here and
22  through U.S. broker-dealers.   Later in 2012, Crown merged into Airware Labs
23  Corp.

24       10.    Zwebner, age 52, is a dual British and Israeli citizen and resides in
25  Jerusalem, Israel.  During the relevant time period, he purported to be an accountant
26  and consultant who organized companies that traded on the U.S. over-the-counter
27  market.  The Commission is filing a separate action against Zwebner.

28

III.   **JURISDICTION AND VENUE**

11.    The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d) and 77v(a); and Sections 21(d) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa(a).

12.    The Court has personal jurisdiction over Defendants and venue is proper in this District because, among other things, Defendants participated in the offer or sale of securities in this District, and many of the acts and transactions constituting the violations alleged in this Complaint occurred in this District.  In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the Commission's claims occurred here.

13.    In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, the mails, and/or the facilities of a national securities exchange.

IV.   **FACTUAL BACKGROUND**

       A.    **The Creation and Sale of the Crown Shell**

14.    Zwebner created Crown as a shell company.  Although the original record owners of the company and its stock ostensibly were two officers, Amir Rehavi ("Rehavi") and Chanah Zehavi ("Zehavi"), in reality Zwebner controlled all of the stock.  In September 2010, he filed an S-1 registration statement with the Commission for a purported self-directed offering under the smaller company reporting rules and, behind the scenes, managed every aspect of the registration process. In September 2011, Crown's registration became effective.

15.    Zwebner, whose name and control of the company were undisclosed in the registration statement, conducted a sham IPO through which he placed Crown's free-trading shares with 40 Israeli purported subscribers, but never delivered their certificates.  Instead, Zwebner took possession of the certificates, and the

- 5 -

subscribers never paid consideration for the shares and were unaware their names even were involved at all.  This initial public offering therefore was a sham.

16.    To add a further sense of legitimacy to the offering, however, and to make the Crown shell a more attractive target for sale, Zwebner engaged a U.S. broker-dealer in September 2011 to sponsor Crown's false application under Rule 15c2-11 of the Exchange Act, 17 CFR § 240.15c2-11, so that Crown's common stock would be quoted on the OTCBB and the OTC Link (an SEC-registered Alternative Trading System).   On or about November 2, 2011, the Financial Industry Regulatory Authority ("FINRA") approved the application.  Zwebner then had a valuable commodity to sell:  a fully-registered shell company with 2.5 million free-trading shares, and a ready-made trading market into which the shares could be sold.

17.    Ultimately, Larson purchased the Crown shell from Zwebner. On or about December 6, 2011, Larson wired $300,000 from a bank account titled to an entity he controlled – S&L Investments, LLC – to Zouvas' trust account, which reflected that payment was for Crown.  Two days later, Zouvas wired $25,000 to Zwebner.  On or about December 14, 2011, Zouvas wired an additional $206,127 to Zwebner through a financial cash change house in Jerusalem.  The next day, Larson wired an additional $25,000 from the same bank account he controlled to another of Zouvas' trust accounts.  Larson thus gained control of Crown's 2.5 million freely-tradable shares that Zwebner had fraudulently placed in the names of the 40 Israeli subscribers and the shares held by the two nominee officers of the company.

18.    Acquiring control of a publicly traded company generally involves an acquisition or tender offer pursuant to which the acquirer purchases a control block of common stock from the shareholders.  Here, Larson purchased all of Crown's free-trading shares by paying and arranging for payment to Zwebner, who was not even a named shareholder.  Larson was able to gain control in this unusual manner because Zwebner was simply transferring control of Crown's outstanding stock,

1  including the two nominee officers' shares and the shares placed with the 40 Israeli
2  subscribers in the sham IPO.

3  **B.  Larson Places Crown Shares with His Nominees**

4  19.  On or about December 14, 2011, after the purchase of the Crown shell
5  was complete, Larson arranged for Jorgenson and Schiprett to receive 218,750
6  Crown shares each from seven of the original Israeli subscribers for a total purchase
7  price of $25,850.  In reality, however, this arrangement was a sham.  As alleged
8  above, the original subscribers never received or paid for their shares (because they
9  were simply nominees for Zwebner), and Schiprett and Jorgenson never purchased
10  the Crown shares (because they were nominees for Larson).  Larson orchestrated
11  this ruse to conceal his trading in Crown stock, and Jorgenson and Schiprett knew,
12  or were reckless in not knowing, they were participating in a scheme to conceal
13  Larson's true ownership of the stock.

14  20.  In or around December 2011, Zouvas was retained as Crown's general
15  counsel.  One of his duties was to instruct the transfer agent on issuing, canceling,
16  re-issuing and otherwise transferring Crown stock certificates among record
17  shareholders.  Larson turned to Zouvas to have the Crown certificates transferred
18  into the names of Jorgenson and Schiprett.

19  21.  On or about January 3, 2012, Zouvas directed Crown's transfer agent
20  to transfer the shares from the seven Israeli subscribers to Jorgenson and Schiprett.
21  However, Zouvas instructed the transfer agent to send the certificates to Larson,
22  rather than to Jorgenson and Schiprett, the supposed shareholders of record.  The
23  transfer agent did as Zouvas directed.  As a result of a 3-for-1 forward stock split,
24  Jorgenson and Schiprett became the record owners of 656,250 free-trading Crown
25  shares each.

26  22.  The next step in the scheme was for Jorgenson and Schiprett to sell the
27  shares and remit the proceeds to Larson.  On or about January 4, 2012, they each
28  opened securities brokerage accounts and attempted to deposit the Crown shares

into them.  However, before allowing the deposit, the brokerage firm requested proof they had purchased the shares.  Because they had not paid for the shares, however, no such proof existed.

23.    To enable Jorgenson and Schiprett to make the deposit, Zouvas prepared a false attestation for them to provide to the brokerage firm. The attestation was dated January 17, 2012.  In it, Zouvas wrote that his law firm had acted as escrow agent for the transaction in which Jorgenson and Schiprett had purchased Crown shares for $25,850.  He misrepresented that on December 14, 2011, he sent the funds to the selling shareholders. The attestation was false because Zouvas's escrow account never received the funds from Jorgenson and Schiprett, and never remitted the funds to the seven purported subscribers. When Zouvas provided the attestation, he knew, or was reckless in not knowing, that it was false.

24.    Jorgenson and Schiprett in turn provided Zouvas' false attestation to the brokerage firm, which allowed them to deposit the Crown shares into their newly-opened brokerage accounts.  Because they did not transfer funds to Zouvas' escrow account, Jorgenson and Schiprett knew, or were reckless in not knowing, that they were providing a false document to the brokerage firm.

25.    On or about January 24, 2012, Jorgenson authorized Larson to place trades in his newly-opened brokerage account.

**C.    Larson and Robb Install a CEO for Crown, But Larson Retains Control of the Company**

26.    After Jorgenson and Schiprett were in place, Larson needed to inflate the market price of Crown's stock so he could make back the money he spent to purchase the Crown shell, and reap additional trading profits.  His first step in the "pump" phase of the scheme was to obtain a product for Crown by means of which he could deceive public investors into believing Crown would generate substantial revenue.  Larson and Robb decided Crown's product would be a wireless device

that would monitor senior citizens and special needs adults, branded as "PomCom." PomCom was the invention of an entrepreneur named Steven Aninye ("Aninye") who owned the technology through his alter ego company, Zorah, LLC.

27.     Although the PomCom existed and was functional, in order for any significant number of the devices to be in use simultaneously, there needed to be an operational infrastructure, including a support staff to receive and act upon the devices' electronic signals.  Aninye did not have sufficient funding to pay for the infrastructure.  As a result, he was willing to enter into an arrangement with Larson and Robb who assured him that by associating with Crown, he would obtain the funding necessary to support the product. That funding, however, never materialized.

28.     In or around January 2012, Larson and Robb solicited Aninye to become Crown's CEO.  In an email dated January 5, 2012, Larson informed Aninye, copying Robb: "Great news! The shell we have is Crown Dynamics Corp. symbol (CDYYD)." Larson also told Aninye he had been providing the funding for Crown and that now he wanted to recover his money.  Robb told Aninye that he and Larson were acquiring Crown by buying off the existing owners, that they would make Aninye the company's CEO, and that, as a result, money would never again be a problem for Aninye.

29.     That same month, Larson and Robb installed Aninye as Crown's CEO. Shortly thereafter, Zouvas' law firm prepared an agreement whereby Aninye's company, Zorah LLC, licensed the PomCom technology to Crown.  An attorney in Zouvas' law firm emailed the draft agreement to Larson, and Zouvas participated in one or more conference calls with Larson, Robb and Aninye concerning the agreement.

30.     In a February 2, 2012 email, Robb suggested to Aninye that Larson's and/or Robb's control of the public float of Crown stock was compensation for providing: a "[c]lean public company ready to trade"; "3 months of marketing to

the company to bring in new investors and provide the stock with a true market";
and "Knowledge, Network, and understanding to establish market price and
position the company for financings . . . ."

**D.    Crown's Public Filings Falsely Report Aninye's Stock Ownership**

31.    On January 18, 2012, Crown filed a Form 8-K "Current Report" ("8-K") with the Commission.  On the cover page, the 8-K requested that copies of all communications be sent to Zouvas' law firm.  The 8-K disclosed that as of January 17, 2012, Crown's purported sole officers and directors, Rehavi and Zehavi, had resigned from the company and that Aninye had been appointed CEO and Chairman of the Board.  The 8-K also stated that on January 17, 2012, Aninye had acquired from Rehavi and Zehavi nine million shares of Crown's common stock, representing approximately 54.54% of Crown's issued and outstanding common stock, and that Rehavi and Zehavi were paid $180,000 for the shares.

32.    The 8-K was false because Aninye never paid for the shares and never received the share certificates, even though he signed a share purchase agreement. Rehavi was unaware he was listed as an officer or director of Crown, did not act in either capacity, and first heard about Crown when contacted by the Israel Securities Authority ("ISA") in mid-2014 when it was assisting the Commission in the investigation of this matter.

33.    Although Crown publicly announced Aninye had purchased Rehavi's and Zehavi's shares, Zouvas did not, at that time, instruct the transfer agent to cancel their share certificates or reissue them in Aninye's name.  In fact, the certificates remained in Rehavi's and Zehavi's names for roughly seven months after Aninye purportedly purchased their stock.

34.    Zouvas did eventually direct the transfer agent to remove Rehavi's and Zehavi's names as record shareholders.  But he did not direct the transfer agent to transfer the shares to Aninye.  Instead, on or about July 23, 2012, Zouvas instructed

1   the transfer agent to cancel the share certificates and retire the nine million shares to
2   Crown's treasury account.

3       35.    On March 14, 2012, Crown filed a Form 10-K "Annual Report" ("10-
4   K") with the Commission.  Zouvas approved a draft of the Form 10-K falsely
5   reporting that Aninye owned the nine million shares of Crown, a statement which
6   was repeated in the final Form 10-K.  Zouvas became Crown's general counsel in
7   December 2011 and took responsibility for directing the transfer agent any time
8   shares of Crown needed to be cancelled or reissued.  Zouvas therefore knew Aninye
9   did not receive any shares from Rehavi and Zehavi because he had not directed the
10  transfer agent to cancel the Rehavi and Zehavi share certificates or reissue them in
11  Aninye's name.

12      36.    In a communication with FINRA three months later, Zouvas
13  reaffirmed the false 8-K by stating Aninye had purchased the nine million shares of
14  Crown from Rehavi and Zehavi for $180,000: "On January 17, 2012, the Company
15  executed a Stock Purchase Agreement, under which 9,000,000 (post-split) shares of
16  common stock of the Company were sold by Rehavi and Zehavi to Steve Aninye in
17  exchange for $180,000." Zouvas knew, or was reckless in not knowing, that his
18  statement to FINRA was false because (i) he never had the shares placed in
19  Aninye's name, and (ii) he directed the transfer agent to cancel the shares and retire
20  them to Crown's treasury.

21      **E.**    **Larson's Role as a _De Facto_ Officer of Crown and Robb's Role as**
22          **Crown's Marketing Agent**

23      37.    From December 2011 until at least July 2012, Robb took responsibility
24  for Crown's marketing campaign.  He prepared the company's press releases and
25  with the assistance of a family member created its corporate web page.  Robb
26  issued at least one press release before Aninye had a chance to review and comment
27  on its accuracy.  Robb also rejected changes to the corporate web page that Aninye
28  proposed.  In late January 2012, Robb suggested to Aninye that Robb create a

1   virtual office for Crown in Scottsdale, Arizona (near where Robb and Larson
2   resided, even though Aninye resided in Atlanta, Georgia).  In doing so, Robb wrote:
3   "If Investors, Finra, SEC, have any indication that this is not a company worthy of
4   being public we will have a can of worms opened and we do not want that."

5          38.    From December 2011 until at least July 2012, Larson served as
6   Crown's *de facto* chief financial officer ("CFO") and secretly controlled Crown.
7   Aninye viewed Larson as a seasoned CFO responsible for handling Crown's
8   finances. Larson paid various third-party service providers on behalf of Crown,
9   including, among others, Zouvas, as Crown's general counsel; Crown's transfer
10  agent; and for a Standard & Poor's listing.

11         39.    Larson also assisted in preparing Crown's financial statements.  In an
12  April 18, 2012 email to Aninye, Robb, and potential new management for Crown,
13  Larson wrote: "Dave [an outside accountant] and I took the liberty of assisting
14  Steve prepare his/Crowns financials prior to air coming on board . . . ." In
15  particular, Larson assisted the outside accountant in preparing, among others,
16  Crown's draft Unaudited Combined Pro Forma Balance Sheet as of December 31,
17  2011, and its Unaudited Combined Pro Forma Income Statement for the Three
18  Months Ended March 31, 2012.  Larson also was the point-of-contact for Crown's
19  outside auditor.  For example, on February 24, 2012, the auditor emailed Larson:
20  "As part of our audit of Crown we need to review the draft 10-K.  Please send the
21  draft when it is available."  On February 28, 2012, Larson sent the auditor the draft
22  10-K with the cover message: "This our final [sic] may have a few minor
23  changes[.]" And when, in May 2012, Crown needed financial records from 2011 –
24  before Larson purchased the company from Zwebner – Larson emailed Zwebner:
25  "Do you have 1/1/11 through 3/31/11 income statement for Crown Dynamics?"

26         40.    Despite his control of Crown's financial activities, Larson's name
27  appeared nowhere in Crown's public filings, including the 10-K filed with the
28  Commission on March 14, 2012.  Crown's filings also did not disclose the fact that

Larson – by virtue of his having purchased the Crown shell from Zwebner in December 2011 – owned Crown's outstanding stock.

41.     Larson knew, or was reckless in not knowing, the Form 10-K was false because it failed to disclose his stock ownership and control of the company. Having acted as escrow agent for Larson's purchase of the Crown shell, and then general counsel, Zouvas knew, or was reckless in not knowing, that Crown's public disclosure of its securities ownership was materially false and misleading.

### F.     Larson and Robb Artificially Inflate Crown's Stock Price

42.     Having installed Aninye as CEO and licensed his product, Larson and Robb were ready to "pump up" Crown's stock price so that Larson could dump his shares into the market at inflated prices.  In late January 2012, they hired a "call center" to tout Crown's stock to brokers.  On January 26, 2012, Robb emailed Aninye that a "[c]all center is going to kick this off on Monday" and that "[t]hey would like to do a webinar with you as they announce the deal to the 23+ guys who will be making 2000 calls per day for the next 90 days."  The purpose of the call center, Robb told Aninye, was to generate "buzz" in the market.  Robb also told Aninye that the market awareness campaign would last for just 90 days.  Then, Aninye would be on his own to drive the share price up, although he could hire Robb to continue the campaign.  The following day, Larson communicated to Aninye, copying Robb, that Aninye would "need to do a [sic] investor presentation to 23 brokers" and that "[t]his is SO IIMPORTANT [sic] to knock their socks off on this."

43.     Larson paid a company called Bay Hill Partners LLC ("Bay Hill") doing business as the Ritman Agency ("Ritman") to publicize Crown in order to increase its stock price.  During the period January through April 2012, from bank accounts belonging to Bull Market and National Cash & Credit, LLC ("NCC") (another entity Larson controlled), Larson wired a total of $400,000 to Bay Hill. Bay Hill operated the "call center," through Ritman, a self-described "full service

advertising firm, dedicated to aiding the success of emerging public companies" that works "to communicate your company's story to our vast network of brokers . . . ." In exchange for Larson's payments to Bay Hill, Ritman conducted an aggressive awareness campaign to get stock brokers to recommend purchases of Crown stock or to purchase the stock for their own accounts. Ritman representatives placed 1,500 to 2,000 sales calls per day and were paid commissions only for purchases that were made at the offer price.

44.     A Ritman employee who helped to manage the market awareness campaign considered Larson the point of contact at Crown. In preparation for the campaign, she gathered publicly-available information on Crown and prepared a page of bullet points about Crown for Ritman's callers to use when recommending the stock to brokers. Among the bullet points were those labeled "Reasons to Own." On January 25, 2012, the employee emailed the draft bullet page to Larson, requesting that he let her know if anything needed to be changed or if there was anything important that needed to be highlighted.

45.     To provide the call center with information to include in its campaign, Robb drafted press releases trumpeting the revenue-generating prospects of the PomCom device. He did so in order to supply the call center with material it could use to tout Crown's stock to the market.

46.     On January 30, 2012, Robb emailed Aninye, copying Larson, a draft press release titled: "Crown Dynamics is now ready to enter a $14.5 Billion U.S. healthcare market opportunity with its proprietary hardware and software solution." Robb copied Larson on the email. The press release contained a purported quotation from Aninye stating in part: ". . . our technology provides Crown with a turn key solution that will allow the company to quickly enter the market and immediately begin generating revenue." Aninye did not want to issue the press release as written. He believed it was inaccurate to announce that Crown was entering a market, because Crown did not have the infrastructure to support the

operations of the PomCom device.  He replied to Robb:  "I will like for us to take a different approach with this PR.  I think it is not about Crown entering a market but Crown announcing a new product.  I will take a stab at it.  Also, let's do it tomorrow and use today to massage it a bit."  In response, Robb replied that he had already issued the press release, without waiting for Aninye to correct it.  Robb knew, or as reckless in not knowing, that the press release was not accurate.

47.    On February 7, 2012, Robb drafted and caused Crown to issue another misleading press release.   The press release stated that Crown "is pleased to announce that it has initiated full commercial use of its Location Based Software Service Platform."  It also contained the following quotation purportedly from Aninye:  "Owning and operating the platform allows our company to generate revenue from direct high margin solutions as well as in-direct services to other equipment manufacturers."  The press release was inaccurate because the PomCom was not generating revenue for Crown in February 2012.  In fact, in an email sent on March 5, 2012 from Larson to Aninye copying Robb, Larson remarked: "Every investor I speak to about investing in Crown points to the . . . fact you have zero sales."  Robb knew, or was reckless in not knowing, that the press release was inaccurate.

48.    The "pump" was successful.  On or about January 30, 2012, Ritman kicked off its campaign to induce investors to purchase Crown stock.  That day, the trading volume in Crown's stock was approximately 191,000, a 95-fold increase over the 2,000 shares that had changed hands on the prior trading day.  During the 90-day period of call-center activity, Crown's stock price increased substantially from its $1.40 per share market price immediately before the call center activity began.  On April 20, 2012, Crown's stock price reached $2.50 per share.

49.    Each morning during the campaign, Ritman emailed Larson a spreadsheet showing Crown purchases that resulted from the calls to brokers.  At the conclusion of the market awareness campaign, Ritman reported the results to

Larson.  On May 2, 2012, it emailed Larson a spreadsheet that displayed trading in Crown stock during the period January 30, 2012, through May 1, 2012.  The spreadsheet identified the date, time, volume and price of each Crown trade, and the brokerage firm through which the trade was made.

50.    During the 90-day period of call-center activity, Larson also engaged in his own manipulative trading to create the appearance of an active market in Crown's stock, as a further inducement to investors to purchase the stock.  On or about February 1, 2012, Larson purchased 250 shares of Crown stock in his personal trading account, for $1.68 per share.  The same day, Larson sold the 250 Crown shares for the same price, $1.68 per share.  Thereafter, during the next three months Larson purchased or sold Crown stock 44 more times.  There was no legitimate investment purpose to his trading.  All told, Larson purchased 7,460 shares and sold the same amount.  Larson knew, or was reckless in not knowing, that his own trading was not for legitimate investment purposes but instead to deceive investors into believing there was an active trading market for Crown's stock.

**G.    Larson Dumps Crown Shares into the Inflated Market through his Nominees**

51.    While Larson and Robb were successfully "pumping up" Crown's stock price, Schiprett and Jorgenson were selling their shares into the inflated market.

52.    Between January 25, 2012, and May 2, 2012, Schiprett sold 220,793 shares of Crown stock he had pretended to purchase from the Israeli subscribers.  The proceeds from those sales were approximately $427,000.

53.    Between January 30, 2012, and April 12, 2012, Jorgenson sold 273,086 shares of the Crown stock he had pretended to purchase from the subscribers.  The proceeds from those sales were approximately $488,000.

54.     As Jorgenson and Schiprett sold the stock, they quickly funneled most of the proceeds back to Larson, the undisclosed owner of the stock.

55.     Between March and May 2012, Schiprett transferred approximately $402,000 of the trading proceeds to two bank accounts over which Larson was the authorized signatory – 84% of it to an account belonging to Bull Market, and 16% to NCC, the other bank account Larson controlled.

56.     During almost the same period, Jorgenson transferred approximately $462,000 of the trading proceeds to the Bull Markets account that Larson controlled.

57.     Larson thus received at least $865,000 as a result of his nominees' sales of Crown stock. Schiprett retained approximately $25,000 of the trading proceeds as compensation for his role in the scheme and Jorgenson retained approximately $26,000 of the proceeds.  Subsequently, on or about May 23, 2012, after the Crown stock had been sold through his brokerage account and he had wired the proceeds to Larson, Jorgenson directed the brokerage firm to remove Larson's authority to trade in the account.

58.     The call center activities ended in or about early May 2012, and after that Crown's stock price declined significantly.  By May 16, 2012, the price had dropped to $1.60 per share.  On May 23, 2012, it closed at $0.99 per share.  By August 2012, it was trading at less than one dollar per share and, in September 2012, it traded as low as $0.37 per share.

59.     Through his payments to Bay Hill, Larson recommended that public investors purchase shares of Crown. Unbeknownst to the market, at that very time Larson, through Schiprett and Jorgenson, was selling almost a half million shares of Crown stock against his buy recommendation and at the expense of the investing public. Larson knew, or was reckless in not knowing, that his sales of large quantities of his Crown stock ran counter to the buy recommendations he was paying Bay Hill to make.

**H.     Zouvas Receives Crown Shares and Provides False Certification to Transfer Agent**

60.     In or around June 2012, Zouvas received 87,500 shares of Crown stock for which he paid no consideration.  According to a stock purchase agreement dated June 25, 2012, Zouvas purchased 87,500 shares of Crown stock from one of the original purported Israeli subscribers for $2,000.  According to a second stock purchase agreement dated June 19, 2012, a third-party entity purchased 100,000 shares of Crown stock from the same purported subscriber for $2,000. The purported subscriber was – like the other subscribers – Zwebner's nominee.  She did not purchase the shares or sell them to Zouvas or to the third party, nor was she even aware the stock certificate had been issued in her name.   She never communicated with Zouvas and her signature was forged on the Stock Purchase Agreement.

61.     On or about June 25, 2012, Zouvas directed the transfer agent to transfer the subscriber's shares to himself and the third party.  In his instruction letter to the transfer agent, Zouvas wrote, in part: "We certify that these shares have been validly purchased by the following parties," including the third party and Zouvas himself.  The certification was inaccurate because Zouvas did not purchase the Crown shares referred to in the letter, and the purported subscriber did not sell the shares either to Zouvas or the third party.  When Zouvas made the certification, he knew, or was reckless in not knowing, that it was inaccurate.

62.     Approximately one year later, in July 2013, Zouvas deposited the 87,500 Crown shares into his brokerage account.  Between September 27 and October 7, 2013, Zouvas sold all of the 87,500 Crown shares he purportedly acquired for proceeds of approximately $10,300.  Zouvas also received legal fees and other payments related to Crown in addition to his stock sale proceeds.

**I.     Larson Transfers Other Crown Shares into an Additional Nominee Account and Zouvas Prepares a False Attestation Letter and a False Certification**

63.     With Zouvas's assistance, Larson placed some additional Crown shares he had acquired when he purchased the Crown shell in the names of other nominees.  For example, on or about December 14, 2011, an offshore entity named Netlynx Solutions, Ltd. ("Netlynx") purportedly entered into a share transfer agreement with six of the original purported Israeli subscribers.  Pursuant to the agreement, Netlynx purchased 375,000 Crown shares (1.125 million post-split shares) for $20,800.  Netlynx, however, did not pay for the shares pursuant to the share transfer agreement. On or about January 3, 2012, Zouvas instructed the transfer agent to transfer 1.125 million Crown shares from the subscribers to Netlynx. He further instructed the transfer agent to send the Netlynx share certificate to Larson.

64.     A few weeks after Larson received the Netlynx certificate, Robb emailed a letter to Aninye, with the instruction: "Please sign the attached letter and fax it or scan it to Chris [Larson] asap."  The letter was addressed to a brokerage firm and concerned 1.125 million Crown shares held by Netlynx.  The letter was written for Aninye's signature, and it certified, among other things, that Netlynx had acquired the shares from several of Crown's IPO subscribers.  The letter also stated the brokerage firm "is permitted to rely on the above representations in accepting the deposit of the Shares into a brokerage account for resale." As instructed by Robb, Aninye signed the letter.

65.     On or about January 31, 2012, just as he had done for Schiprett and Jorgenson, Zouvas provided a false attestation letter submitted to the same securities brokerage firm about Netlynx's shares.  Zouvas wrote that on December 14, 2011, he had acted as escrow agent for Netlynx's purchase of Crown stock.  He falsely attested that he had sent the funds from his escrow account to the sellers.

Zouvas' attestation was false because Netlynx did not pay any funds into Zouvas' escrow account on December 14, 2011, and Zouvas never sent funds to the Israeli subscribers who purportedly sold their shares to Netlynx. When Zouvas made this attestation he knew, or was reckless in not knowing, that it was false.

66.     At or about the time Larson and Zouvas transferred Crown shares to Netlynx, they transferred additional shares into the name of another nominee, one of Larson's family members. Larson persuaded him to sign a share purchase agreement that purported to show the purchase of 187,500 Crown shares from one of the original purported Israeli subscribers for $3,645. The subscriber was, in reality, Zwebner's nominee.  She never paid for the Crown shares and was unaware the shares even had been issued in her name.  Likewise, Larson's family member never paid for the shares he had purportedly purchased from the subscriber.

67.     On or about February 2, 2012, Zouvas instructed the transfer agent to transfer the subscriber's shares to Larson's family member, but to send the newly-issued share certificate to Zouvas rather than to the family member, the shareholder of record.  In Zouvas's instruction to the transfer agent, he provided the following false certification: "We certify that these shares have been validly purchased by the following parties." By February 21, 2012, the stock certificate was in Larson's hands, not his family member's.

68.      Several months later, the family member saw the stock certificate for the first (and only) time, but only briefly.  Larson sent it to him – but only to facilitate the transfer of the certificate to a third party. Larson instructed him to obtain a medallion signature guarantee on the certificate and return it to Larson.

69.     Under certain circumstances, in order to transfer or sell securities, a shareholder must have his or her signature guaranteed by a financial institution – this process is often referred to as a medallion signature guarantee.

70.     The family member did as he was instructed and returned the medallion signature certificate to Larson.  Shortly thereafter, Larson sold the shares

to a third party without the family member's knowledge. The family member's signature was forged on the share transfer agreement, and he never knew of the transaction or received any financial benefit from the sale of his shares.

71.   In July and December 2012, Defendants made additional sales of Crown stock.  On or about July 16, 2012, approximately 3.3 million shares were sold to third-party purchasers pursuant to share purchase agreements between the purchasers and several of the original Israeli IPO subscribers.  However, as alleged above, Larson had purchased all of the free-trading shares from Zwebner and allocated a portion of those shares to, among others, Schiprett and Jorgenson. These additional 3.3 million shares were part of Larson's purchase that had not otherwise already been allocated.  On or about July 25, 2012, Zouvas received $57,551.31 into his escrow account from the purchasers as the sale proceeds for the sale of these additional shares of Crown stock.  Zouvas in turn wired $17,271 of this money to the NCC bank account Larson controlled and $40,000 to Bay Hill, which used the money for a promotional campaign they were conducting on Larson's behalf pertaining to another issuer.

72.   On December 4, 2012, Zouvas received $39,545 into his escrow account from some or all of these same purchasers as the sale proceeds for the sale of an additional approximately 2.1 million shares of Crown stock from Larson's family member, Jorgenson, Schiprett, and Netlynx.  Zouvas subsequently wired $39,000 of this money to the Bull Markets bank account that Larson controlled. Robb signed the stock power for the sale of the Netlynx shares, indicating his control over those shares.  In addition, at least 1.3 million additional Crown shares were allocated to an entity named Hyperion with which Robb was affiliated.

### Defendants' Scienter

73.   Robb knowingly, recklessly, or negligently drafted and issued false press releases concerning Crown's PomCom product.  Larson engaged Jorgenson and Schiprett to act as nominees to conceal his trading in Crown.  Larson and Robb,

individually or through their entity Bull Market, knowingly or recklessly manipulated the share price of Crown common stock through arranging call-center activity designed to artificially increase the price of the stock.  In addition, Larson engaged in manipulative trading designed to artificially stimulate market interest in the stock.  Larson then sold into that increasing volume and price for profits that were routed back to bank accounts he controlled by Jorgenson and Schiprett.

74.    Jorgenson and Schiprett knowingly provided a letter to a registered brokerage firm that falsely stated they had purchased Crown stock from the original purported subscribers for $25,850. Jorgenson and Schiprett profited from this misconduct by receiving a portion of the proceeds of the trading in Crown stock.

75.    Zouvas provided an attestation to Jorgenson and Schiprett that falsely stated they paid for their Crown shares.  When he did so, he knew or was reckless in not knowing they would provide the attestation to a registered brokerage firm to transact the purchase and sale of securities.  Zouvas provided a similar attestation directly to the brokerage firm that falsely stated Netlynx had paid for its Crown shares. Zouvas also knowingly or recklessly made false and misleading statements to a registered transfer agent concerning payments to the supposed original Crown subscribers in private "sales" transactions.  Zouvas profited at least by receiving Crown shares and legal fees.  He subsequently sold 87,500 of his Crown (Airware) shares in October of 2013 that he acquired in July of 2012.  Zouvas received proceeds of approximately $10,300 in connection with that transaction.

## COUNT I

### Fraud in Violation of Section 17(a)(1) of the Securities Act

### (Against All Defendants)

76.    The Commission repeats and realleges Paragraphs 1 through 75 of its Complaint.

77.    From no later than December 2011 through at least December 2012, Defendants, in the offer or sale of any securities by the use of any means or

instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly knowingly, willfully or recklessly employed any device, scheme or artifice to defraud.

78.     By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT II

### Fraud in Violation of Section 17(a)(3) of the Securities Act

### (Against All Defendants)

79.     The Commission repeats and realleges Paragraphs 1 through 75 of its Complaint.

80.     From no later than December 2011 through at least December 2012, Defendants, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly knowingly, willfully, recklessly, or negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities.

81.     By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT III

### Fraud in Violation of Section 10(b) and Rule 10b-5(a) of the Exchange Act

### (Against All Defendants)

82.     The Commission repeats and realleges Paragraphs 1 through 75 of its Complaint.

83.     From no later than December 2011 through at least December 2012, Defendants directly and indirectly, by use of any means or instrumentality of

interstate commerce, or of the mails, knowingly, willfully or recklessly employed any device, scheme or artifice to defraud in connection with the purchase or sale of any security.

84.   By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a).

## COUNT IV

## Fraud in Violation of Section 10(b) and Rule 10b-5(c) of the Exchange Act

### (Against All Defendants)

85.   The Commission repeats and realleges Paragraphs 1 through 75 of its Complaint.

86.   From no later than December 2011 through at least December 2012, Defendants directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly, willfully or recklessly engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person in connection with the purchase or sale of any security.

87.   By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c).

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find Defendants committed the violations alleged, and:

### I.

### Permanent Injunction

Issue a Permanent Injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or

participation with them, and each of them, from violating the federal securities laws alleged in this Complaint.

## II.

### Disgorgement

Issue an Order directing Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## III.

### Penalties

Issue an Order directing Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

## IV.

### Penny Stock Bar

Issue an Order, pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6), barring Defendants from participating in any future offering of a penny stock.

## V.

### Officer and Director Bar

Issue an Order, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), barring Larson and Robb from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

## VI.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

# VII.

## Retention of Jurisdiction

Further, the Commission respectfully requests the Court retain jurisdiction over this action and over Defendants in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Respectfully submitted,

DATED:  April 25, 2016

SECURITIES AND EXCHANGE COMMISSION

By:   /s/ Patrick R. Costello

PATRICK R. COSTELLO
Attorney for Plaintiff
Email: costellop@sec.gov

OF COUNSEL:

CAROLYN KURR
Maryland State Court E-file No. 9512130114
Email: kurrc@sec.gov
KEITH O'DONNELL
District of Columbia Bar No. 230003
Email: odonnellk@sec.gov

Division of Enforcement
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
Telephone: (202) 551-7000
Facsimile: (202) 772-9245