UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　　　　Plaintiff,<br><br>v.<br><br>LUKE C. ZOUVAS, CAMERON F. ROBB, CHRISTOPHER D. LARSON, JASON M. SCHIPRETT, and ROBERT D. JORGENSON,<br><br>　　　　　　　　　Defendants. | Case No.: 3:16-cv-0998-CAB-(DHB)<br><br>**ORDER ON MOTION TO DISMISS**<br>**[Doc. No. 18]** |

This matter comes before the Court on Defendant Luke C. Zouvas' ("Zouvas") motion to dismiss pursuant to Fed. R. Civ. P 12(b)(6). [Doc. No. 18.] The motion has been fully briefed and the Court finds it suitable for determination on the papers and without oral argument. *See* S.D. Cal. CivLR 7.1(d)(1). For the reasons set forth below, Defendant's motion to dismiss [Doc. No. 18] is **DENIED**.

I.　　BACKGROUND

On April 25, 2016, Plaintiff Securities and Exchange Commission ("the Commission") filed suit against Defendants alleging fraud in violation of Sections 17(a)(1) and 17(a)(3) of the Securities Exchange Act of 1933 ("the Securities Act"), 15

U.S.C. §§ 77(q)(a)(1) and 77(q)(a)(3), and Section 10(b) and Rules 10b-5(a) and 10b-5(c) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b) and 17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c). [Doc. No. 1 ¶¶ 76-87.] In its prayer for relief, the Commission seeks injunctive relief, disgorgement, a civil penalty, and a penny stock bar. [*Id.* pgs. 24-25[1].]

The complaint alleges that Zouvas, along with the four other defendants, perpetrated a "pump-and-dump" scheme to manipulate the stock of Crown Dynamics Corp. ("Crown"), a publicly traded shell company. According to the complaint, Zouvas served as general counsel of Crown and facilitated the scheme by preparing attestations submitted to a brokerage firm and certifications to Crown's transfer agent that falsely stated the circumstances surrounding the purchase of Crown shares. Additionally, the complaint alleges Zouvas was aware that Crown filed a Form 8-K and a Form 10-K with the Commission that contained inaccuracies regarding the ownership of nine million shares of Crown common stock and that, in furtherance of the scheme, he reaffirmed the false statement to the Financial Industry Regulatory Authority ("FINRA").

On July 7, 2016, Zouvas filed his motion to dismiss for failure to state a claim. [Doc. No. 18.] The Commission filed their response in opposition to the motion on August 12, 2016. [Doc. No. 23.] After being granted two extensions [Doc. Nos. 26, 34] Zouvas filed his reply brief on September 19, 2016 [Doc. No. 37].

II.     **ALLEGATIONS OF THE COMPLAINT REGARDING ZOUVAS**

Prior to becoming Crown's general counsel, Zouvas acted as an escrow agent in the transaction between Larson and Zwebner that facilitated Larson gaining control of Crown's 2.5 million freely-tradable shares. [Doc. No. 1 ¶ 17.] Larson purchased Crown from Zwebner, an Israeli accountant who created and secretly controlled the company and its stock. [*Id.* ¶¶ 2, 4.]

---

[1] Document numbers and page references are to those assigned by CM/ECF for the docket entry.

In December 2011, Zouvas was retained as Crown's general counsel and was responsible for directing the transfer agent regarding Crown shares. [Doc. No. 1 ¶¶ 20, 35.] Following his appointment, Zouvas helped Larson to conceal his ownership of Crown shares by transferring two bundles of 218,750 shares to Jorgensen and Schiprett. [*Id.* ¶¶ 19-21.] On January 3, 2012, Zouvas assisted Larson by directing the transfer agent to transfer the shares to Jorgenson and Schiprett while having the agent send the share certificates to Larson. [*Id.* ¶ 20.] As a result of a 3-for-1 forward stock split, Jorgenson and Schiprett each became the owners of record of 656,250 free trading Crown shares.

On or about January 4, 2012, in furtherance of the scheme, Jorgenson and Schiprett opened brokerage accounts and attempted to deposit the Crown shares into them. [*Id.* ¶ 22.] The brokerage firm required Jorgenson and Schiprett to provide proof that they had purchased the shares. [*Id.*] Zouvas provided Jorgenson and Schiprett with an attestation that served as the necessary proof, but the attestation made a number of false misrepresentations. [*Id.* ¶¶ 23-24.] Upon receipt of the attestation the brokerage firm allowed Jorgenson and Schiprett to deposit the Crown shares into their newly opened brokerage accounts. [*Id.* ¶ 24.] The Commission avers that Zouvas knew, or was reckless in not knowing that the attestation was false. [*Id.* at ¶ 23.]

In addition to helping Larson transfer shares to Jorgensen and Schiprett, Zouvas was also assisting Larson place Crown shares into the names of other nominees. [*Id.* ¶ 63, 66.] During December 2011 and January 2012, Zouvas assisted an offshore entity and Larson nominee, Netlynx Solutions, Ltd. ("Netlynx") in its purported purchase of 375,000 Crown shares (1.125 million post-split). [*Id.* ¶ 63.] Concurrently, Larson and Zouvas were also transferring additional Crown shares to another nominee, this time to a member of Larson's family. [*Id.* ¶ 66.] In connection with these sales Zouvas provided false information to the transfer agent and a brokerage firm affirming the purchases when no money had actually changed hands and identifying as a subscriber an individual who has never purchased Crown shares and was unaware that they had been issued in her name. [*Id.* ¶ 63, 65, 66.]

Zouvas also instructed the transfer agent to send the share certificates related to these purchases to Larson instead of to the identified purchasers. [*Id.* 63, 67.]

In January 2012, Aninye was appointed as Crown's Chief Executive Officer, and following his appointment Crown and Zorah LLC, Aninye's company, entered negotiations to license PomCom.[2] [*Id.* ¶ 29.] Larson wanted to license PomCom in order to deceive public investors into believing that Crown's would generate substantial revenue through this product. [*Id.* ¶ 26.] Zouvas participated in one or more conference calls regarding the licensing agreement and an attorney at Zouvas' law firm emailed drafts of the agreements to Larson. [*Id.* ¶ 29.]

On January 18, 2012, Crown filed a Form 8-K with the Commission, that falsely stated that Aninye had acquired over nine million shares of Crown's common stock (54.54% of Crown's issued and outstanding common stock) from Rehavi and Zehavi for $180,000. [*Id.* ¶¶ 31, 32.] In actuality, Aninye never paid for the shares and never received the share certificates. [*Id.* ¶¶ 31, 32.] Following this announcement, the sale did not take place, Zouvas did not facilitate the cancellation of Rehavi and Zehavi's shares or their reissuance in Aninye's name, and Zouvas eventually retired the shares Crown's treasury account. [*Id.* ¶¶ 32-34.] Zouvas would later reaffirmed this misstatement to FINRA. [*Id.* 36.] The Commission avers that Zouvas knew, or was reckless in not knowing, this his statement to FINRA was false because he had never had the shares placed in Aninye's name. [*Id.*]

The March 14, 2012, Form 10-K filed with the Commission contained similar misstatements regarding Aninye's ownership of the nine million shares. [*Id.* ¶ 35.] Zouvas had approved the draft of the Form 10-K and knew that the reported share transfer had not taken place. [*Id.*]

---

[2] PomCom is a wireless device that monitors senior citizens and special needs adults that was invented by Aninye and is owned by Aninye's alter ego company, Zorah, LLC. [Doc. No. 1 ¶ 26.]

In June 2012, Zouvas received 87,500 shares of Crown stock for which he paid no consideration. [*Id.* at ¶ 60.] Around the same time, a third- party entity purportedly purchased 100,000 shares of Crown stock for $2,000. [*Id.*] The documentation surrounding both purchases falsely stated that consideration had been paid for the stock and contained the name and forged signature of an individual who was not even aware that the stock certificate had been issued in her name. [*Id.* ¶¶ 60-61.] On June 25, 2012, Zouvas directed the transfer agent to effectuate the transfer of the shares to himself and the third-party. [*Id.* ¶ 61.] The Commission alleges that when Zouvas made the certification to the transfer agent he knew, or was reckless in not knowing, that it was inaccurate. [*Id.*] In July 2013, Zouvas deposited the 87,500 Crown shares into his brokerage account. [*Id.* ¶ 62.] Zouvas later sold all of these shares for proceeds of approximately $10,000.[3] [*Id.*]

On July 16, 2012 and December 4 2012, Zouvas acted as escrow agent for Defendants when they covertly sold stock purported to belong subscribers of the original IPO. [*Id.* ¶¶ 43, 71, 72.]

## III.   LEGAL STANDARD

Under Rule 12(b)(6), a party may bring a motion to dismiss based on the failure to state a claim upon which relief may be granted. A Rule 12(b)(6) motion challenges the sufficiency of a complaint as failing to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). The facial plausibility standard is not a "probability requirement" but mandates "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal quotations and citations omitted). For purposes of ruling on a Rule 12(b)(6) motion, the court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the non-moving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.,* 519 F.3d 1025, 1031 (9th Cir. 2008). "[D]ismissal may

---

[3] In addition to his stock sale proceeds, Zouvas also received legal fees and other payments related to Crown. [Doc. No. 1 ¶ 62.]

be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys.,* 534 F.3d 1116, 1121 (9th Cir. 2008) (internal quotations and citations omitted).

In addition to the pleading requirements of Rule 12(b)(6), a complaint alleging securities fraud must satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *See infra* IV.A.

## IV. DISCUSSION[4]

Defendant Zouvas contends that the complaint fails to state a claim under Section 17(a)(1) and 17(a)(3) of the Securities Act or Section 10(b) and Rules 10b-5(a) and 10b-5(c) of the Exchange Act and that the Commission fails to plead its claims with the particularity required by Rule 9(b).

### A. *Heightened Pleading Standard of Particularity Pursuant to Federal Rule of Civil Procedure Rule 9(b)*

Zouvas contends that the complaint fails to meet the Rule 9(b) pleading standard because it fails to specifically allege which fraudulent statements he purportedly made and fails to specify that any particular statements were false at the time they were made. [Doc. No. 18-1 pgs. 17-18.] Further, Zouvas contends that the complaint fails to connect the alleged fraud to any specific security offering and that the complaint's conclusory

---

[4] Zouvas lodged numerous exhibits as evidence in support of his motion. [Doc. Nos. 19-2–19-6.] On a motion to dismiss the court's analysis is limited to the pleadings, materials incorporated in the pleadings by reference, and matters of which the court may take judicial notice. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1061 (9th Cir. 2008). The Court does not agree with Zouvas' assertion that the lodged documents are extensively referenced by Plaintiff in the complaint and therefore should be incorporated by reference. *See Van Buskirk v. CNN,* 284 F.3d 977, 980 (9th Cir. 2002). Additionally, the Commission challenges the authenticity of the exhibits [Doc. No. 23 pg. 20] which prohibits the Court from considering the lodged exhibits. *See, e.g., Coto Settlement v. Eisenberg.* 593 F.3d 1031, 1038 (9th Cir. 2010) (the Ninth Circuit has extended the "incorporation by reference" doctrine to take into account documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.") Because all of the materials are not appropriate for considerations on a motion to dismiss, the Court has not considered them in connection with this opinion.

allegations leave him having "to guess what it is that the SEC contends he did that [] specifically violated the securities laws." [*Id*. at pg. 18.]

Since this is an action for securities fraud, Plaintiff is subject to the heightened pleading standard of Civil Procedure 9(b). Rule 9(b) requires that a party "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The particularity requirement of Rule 9(b) is met if the complaint "identifies the circumstances of the alleged fraud so that defendants can prepare an adequate answer." *Cooper v. Pickett* 137 F.3d 616, 627 (9th Cir. 1997) (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 960 (9th Cir. 1996)).

Despite these heightened pleading standards, the "SEC is not required to plead detailed evidence concerning each and every fraudulent act alleged." *SEC v. Levin*, 232 F.R.D. 619, 624 (C.D. Cal. 2005) (citing *Cooper,* 137 F.3d at 627). Additionally, the Commission may aver scienter allegations generally since "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *Fecht v. Price Co.*, 70 F.3d 1078, 1082 n. 4 (9th Cir. 1995), *cert denied*, 517 U.S. 1136 (1996) ("Plaintiff may simply state that scienter existed to satisfy the requirements of Rule 9(b).")[5]

Here, the complaint clearly identifies the dates on which Zouvas' fraudulent conduct occurred, the nature of the fraudulent conduct and why it was fraudulent. Specifically, the complaint gives the dates that Zouvas provided the alleged false attestations, [*see* Doc. No. 1 ¶¶ 23, 65, 67], alleges how the false attestations helped Zouvas' co-defendants [*see id.* at

---

[5] *See also SEC v. Mozilo*, No. 09-3994, 2009 WL 3807124, at * 14 (C.D. Cal. Nov. 3, 2009) ("the SEC is only required to comply with [Rule 9(b)] and thus may allege scienter generally"); *SEC v. Leslie,* No. 07-3444, 2008 WL 3876169, at *6 (N.D. Cal. Aug. 19, 2008) ("plaintiffs may aver scienter generally, just as the rule states – that is, simply by saying that scienter existed"); *SEC v. Sandifur*, No. 05-1631, 2006 WL 538210, at *7 (W.D. Wash. Mar. 2, 2006) ("[T]he SEC need only state that scienter existed.")

¶¶ 2, 24] and provides the dates[6] and nature of Zouvas' alleged misconduct with regards to his interactions with the transfer agent [*see id.* at ¶¶ 21, 33-35, 61, 67, 75]. Additionally, the complaint contains multiple allegations regarding Zouvas' scienter that are sufficient to satisfy the Rule 9(b) requirement that the Commission aver this generally. [*See id.* at ¶¶ 23, 35, 36, 41, 61, 65, 75, 77, 80, 83, 86.] Thus, the Court finds that the complaint has sufficiently identified the circumstances of the Zouvas' participation in the alleged fraud so that he can prepare an adequate answer. *Cooper* 137 F.3d at 627. Accordingly, Defendant's motion to dismiss based on Rule 9(b) is denied.

### B. Scheme to Defraud Under Section 10(b) and Rule 10b-5 Claims

Zouvas makes multiple arguments in support of his contention that the Section 10(b) and Rule 10b-5 claims against him should be dismissed. First, he asserts that the Commission is trying to allege scheme liability as a "backdoor into liability" for those who help others make a false statement or omission in violation of subsection (b) of Rule 10b-5." [Doc. Nos. 18-1 pgs. 19-21; 37 pgs. 4-6.] Relatedly, Zouvas argues that he did not make any material misstatements and that his attestations to the transfer agents were not material. [Doc. No. 18-1 pgs. 19-22.] Secondly, Zouvas contends that that the Commission has failed to adequately plead the requisite scienter. [*Id.* pgs. 22-27.] Finally, Zouvas asserts that Commission failed to establish a violation of the Securities Acts because it has failed to show any purchase or sale of securities in reliance of the alleged misrepresentations. [*Id.* pg. 29.]

Section 10(b) provides that it is unlawful "[t]o use of or employ, in connection with the purchase or sale of any security…any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Misrepresentations and most omissions fall under Rule 10b-5(b) whereas

---

[6] On or about January 3, 2012, February 2, 2012, June 25, 2012, and July 23, 2012 are identified in the complaint as dates on which Zouvas interacted with a transfer agent.

manipulative conduct typically constitutes a scheme to defraud in violation of Rule 10b-5(a) or (c). *See Desai v. Deutsche Bank Securities Ltd.*, 573 F.3d 931, 938 (9th Cir. 2009). In order to succeed "manipulative schemes must usually remain undisclosed to the general public." *Desai* 573 F.3d at 941. In contrast, "[o]missions are generally actionable under Rule 10b-5(b) . . . [and] stem from the failure to disclose accurate information relating to the value of a security where one has a duty to disclose it." *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011) (quoting *Desai,* 573 F.3d at 940).

To state a claim under Rules 10b-5(a) or (c), the Commission must allege (1) a device, scheme or artifice to defraud, or an act, practice or course of business that operates as fraud; (2) in connection with the purchase or sale of securities; (3) scienter; and (4) the use of the means of instrument of interstate commerce. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *SEC v. Phan,* 500 F.3d 895, 907-08 (9th Cir. 2007); *SEC v. Rana Research, Inc.,* 8 F.3d 1358, 1364 (9th Cir. 1993); *WPP Luxembourg* 655 F.3d at 1057 (internal citations and quotations omitted).

The use or employment of any deceptive device or fraudulent schemes in connection with a purchase or sale of securities, including deception as part of a larger scheme to defraud the securities market, is prohibited under Section 10(b). *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199 n. 20 (1976) (defining "device" as "an invention, project, scheme; often a scheme to deceive"); *Superintendent of Ins. v. Bankers Life & Cas. Co.,* 404 U.S. 6, n. 7 (1971). Courts have generally held that a Rule 10b-5(a) and/or (c) claim cannot be premised on the alleged misrepresentations or omissions that form the basis of a Rule 10b-5(b) claim. *WPP Luxembourg,* 655 F.3d at 1057. *See also SEC v. St. Anselm Exploration Co.*, 936 F. Supp. 2d 1281, 1299 (D. Colo. 2013) (citing *SEC v. Daifotis*, No. C 11–00137 WHA, 2011 WL 2183314, at *9 (N.D. Cal. June 6, 2011)) ("scheme liability requires proof of participation in an illegitimate, sham, or inherently deceptive transaction where the defendant's conduct or role has the purpose and effect of creating a false appearance."); *SEC v. Lee,* 720 F. Supp. 2d 305, 334 (S.D.N.Y. 2010) (liability is

appropriate if the defendant has substantially participated in scheme to mislead investors "even if a material misstatement by another person creates the nexus between the scheme and the securities market.")

### 1. Allegations premised on more than alleged misrepresentations or omissions

Zouvas asserts that the Commission's claim is based on nothing more that misstatements or omissions of material fact and that there is no evidence that he participated in the alleged scheme. [Doc. Nos. 18-1 pgs. 19-21; 37 pgs. 4-6.] He contends that the Commission is "attempting to plead around" the Rule 10-b-5(b) requirements determined by the Supreme Court in *Janus* by casting that statements made to a transfer agents as a scheme. [*Id.*] Zouvas argues that under the omissions/misstatements standards of Rule 10b-5(b) he would not be liable as he did not make a material misstatement in a public filing. [*Id.*]

To be liable for a scheme to defraud, "each defendant [must have committed a manipulative or deceptive act in furtherance of the scheme." *Cooper,* 137 F.3d at 624. Secondary actors, other than the securities issuer, may be liable as primary violators under Section 10(b). *Central Bank of Denver v First Interstate Bank of Denver*, 511 U.S. 164, 191 (1994). "If a defendant's conduct or role in an illegitimate transaction has the principal purpose and effect of creating a false appearance of fact in the furtherance of a scheme to defraud, then the defendant is using or employing a deceptive device within the meaning of § 10(b)." *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1050 (9th Cir. 2006), *vacated on other grounds sub nom. Avis Budget Grp. Inc. v. Cal. State Teachers' Ret. Sys.*, 552 U.S. 1162 (2008). Any person or entity, including a lawyer, accountant, or bank, or non-speaking actor who employs a manipulative device or makes a material misstatement (or omission) that is relied on by a purchaser or seller of securities may be liable as a primary violator under 10b-5. *Central Bank*, 511 U.S. at 191; *SEC v. Zandford,* 535 U.S. 813, 821-22 (2002).

The Supreme Court has cautioned that Section 10(b) does not limit deceptive acts to misstatements, omissions by one who has a duty to disclose, and manipulative trading practices as "conduct itself can be deceptive." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 158 (2008). A specific oral or written statement is not needed for liability under Section 10(b) or Rule 10b-5. *Id.*

In support of his position that he cannot be liable because the Commission's claim is based on nothing more than misstatements or omissions of material facts that he did not make, Zouvas cites to *Janus Capital Group, Inc. v. First Derivative Traders,* 564 U.S. 135 (2011), and *SEC v. Kelly,* 817 F. Supp. 2d 340 (S.D.N.Y. 2011). In *Janus,* the Court held that in a private cause of action under Rule 10b-5(b) "the maker of a statement is the person or entity with ultimate authority over that statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker." *Janus,* 564 U.S. at 142. In *Kelly,* the court determined that scheme liability failed because, aside from the public representations defendants made about its advertising transactions, the transactions were not inherently deceptive. 817 F. Supp. 2d at 344. In so holding, the court explained that whether scheme liability under subsections (a) and (c) will attach "hinges on the performance of an inherently deceptive act that is distinct from the alleged misstatement." *Id*.

The Court does not find Zouvas' argument persuasive and therefore declines to turn this case into an omissions one under Rule 10b-5(b)[7]. Rather, the Court has determined that the Commission has alleged facts sufficient to state a viable scheme liability claim under Rule 10b-5(a) and (c). *See Desai*, 573 F.3d at 941.[8] While the misstatements and

---

[7] The Court therefore declines to determine whether Zouvas was a control person and maker of Crown's alleged material misrepresentation for purposes of Rule 10b-5(b).

[8] The court in *Desai* declined to transform a scheme to defraud case into an omissions case simply because the scheme involved some degree of concealment. 573 F.3d at 941. The court explained that "if such nondisclosure of a defendant's fraud was an actionable omission, then every manipulative

11

omissions in the public filings certainly furthered the scheme, the Commission has competently pled the existence of a larger scheme that went beyond mere misrepresentations or omissions. The Commission asserts that Zouvas facilitated the scheme and the misstatements contained in the public filings by making numerous false statements to a transfer agent, a brokerage firm and FINRA. In support of this assertion, the complaint alleges multiple instances of deceptive conduct on the part of Zouvas that, if proven to be true, illustrate that he contributed to the fraudulent scheme. [Doc. No. 1 ¶¶ 20-24, 29, 32-34, 36, 60, 63-67, 71-72.] As alleged, Zouvas' conduct had the purpose and effect of creating false appearances of fact as to the true owners of Crown's securities, legitimized Larson's nominees as stock holders and deceived investors regarding Crown's revenue potential.

For example, it is alleged that subsequent to the filing of the Form 8-K in January, 2012, Zouvas did not facilitate the cancellation of Rehavi and Zehavi's shares or their reissuance in Aninye's name. [*Id.* ¶ 33.] It is further asserted that this sale did not in fact take place and that the shares remained in Rehavi and Zehavi's names. [*Id.* ¶¶ 32, 33.] The Commission contends that approximately seven months after the reported sale, Zouvas in fact canceled the share certificates and retired the nine million shares to Crown's treasury account. [*Id.* ¶¶ 32, 34.]

It is also alleged that the misstatement contained in the Form 8-K regarding Aninye's share purchase for $180,000 was reaffirmed by Zouvas in a statement he made to FINRA. [*Id.* ¶ 36.] The Commission avers that Zouvas knew, or was reckless in not knowing, that his statement to FINRA was false because he had never had the shares placed in Aninye's name. [*Id.*] Moreover, the complaint alleges that on multiple occasions spanning nearly a year, Zouvas provided false attestations and instructions to the transfer agent that helped

---

conduct case would become an omissions case." *Id.* To do so would mean that "all of the Supreme Court's discussion of what constitutes manipulative activity would be redundant." *Id.*

conceal Larson's role at Crown and the level of his stock ownership in the company. [*Id.* ¶¶ 19-21, 63-67.]

Additionally, the complaint asserts that by falsely attesting to the purchases of Jorgenson and Schiprett, Zouvas helped them open brokerage accounts in which Crown shares were placed. [*Id.* ¶ 23-24.] These shares were later sold by Schiprett and Jorgenson for approximately one million dollars, the proceeds of which were funneled back to Larson. [Doc. No. 1 ¶ 52 – 54.] The Commission also alleges that, by virtue of his role as an escrow agent and instructor to the transfer agent, Zouvas facilitated the conduct of the other Defendants by providing inaccurate and false information regarding multiple purchases of Crown shares. [*Id.* ¶ 71-72.] Furthermore, the complaint alleges that Zouvas participated in the negotiations surrounding the acquisition of PomCom, which it is alleged, was done simply to make Crown appear more legitimate to investors. [*Id.* ¶¶ 26, 29.]

The Court concludes that the complaint has sufficiently alleged that Zouvas' conduct had the principal purpose of creating a false appearance with the aim of deceiving the investing public as to Larson and Zwebner's ownership of Crown, the legal provenance of the shares bought and sold by Schiprett, Johnson and other Larson nominees, and the financial prospects of Crown. Therefore, the Court finds that the Commission has sufficiently alleged that Zouvas' contribution to the scheme went beyond assisting with the making of material misstatements or omissions. *See WPP Luxembourg,* 655 F.3d 1039 at 1057 (collecting cases) ("defendant's own conduct contributing to the transaction or overall scheme must have a deceptive purpose and effect."); *In re Global Crossing, Ltd. Sec. Litig.,* 322 F. Supp. 2d 319, 336-337 (S.D.N.Y. 2004) ("a cause of action exists under [Rule 10b-5] subsections (a) and (c) for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant").

### 2. "In connection with" the offer or sale of securities requirement

Additionally, Zouvas contends that his alleged fraudulent acts do not coincide with the sale of securities to the public. [Doc. Nos. 18-1 pgs. 28-30, 37 pg. 6-7.] Relatedly, Zouvas asserts that the attestations to transfer agents were not material to public investors

because there is no legal requirement that they be disclosed to the public. [*Id.* pgs. 21 – 22.]

The Supreme Court has interpreted the requirement that the fraudulent conduct occur in connection with or in the offer or sale of securities broadly so that they "encompass the entire selling process, including the seller/agent transaction." *U.S. v. Naftalin*, 441 U.S. 768, 773 (1979). "The elements are met if the fraud and the securities transaction coincide." *Zandford,* 535 U.S. at 822. Unlike Rule 10b-5's clause (b), clauses (a) and (c) "make no reference to a requirement that defendants charged under the rule must fail to disclose material facts for their conduct to be proscribed." *U.S. v. Charnay,* 537 F.2d 341, 350-51 (9th Cir. 1976).

In the Ninth Circuit the "in connection" condition "is met if the fraud alleged 'somehow touches upon' or has 'some nexus' with 'any securities transaction." *Rana Research,* 8 F.3d at 1362 (quoting *SEC. v. Clark,* 915 F.2d 439, 449 (9th Cir. 1990)).[9] A fraud that touches the intrinsic value of a securities and the means of accomplishing the purchase of securities is sufficiently connected to a securities transaction to bring the fraud within Section 10(b). *Id.* (citing *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 651 F.2d 615, 619 (9th Cir. 1981); *cf. In re Fin. Corp. of Am. S'holder Litig.,* 796 F.2d 1126, 1130 (9th Cir. 1986)). *See also SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2nd Cir. 1968) (connection requirement is satisfied whenever assertions are made in a manner "reasonably calculated to influence the investing public."). In actions brought by the Commission the "in connection" requirement "remains as broad and flexible as is necessary to accomplish the statute's purpose of protecting investors." *Rana Research*, 8 F.3d at 1362 (collecting cases)[10].

---

[9] The *Rana* court also explained that when the fraud alleged involves public dissemination in any document presumably relied upon by an investor, the "'in connection with' requirement is generally met by proof of the means of dissemination and the materiality of the misrepresentation or omission." *Rana Research*, 8 F.3d at 1362.

[10] *See SEC v. Warner*, 652 F. Supp. 647, 651 (S.D. Fla. 1987) (allegation that fraud affected market for publicly traded security established "in connection with" element sufficient to withstand motion to

14

Zouvas contends that the false attestations and certifications he personally made could not have misled public investors because there is no legal requirement that such statements be disclosed to the public. [Doc. No.1 pgs. 21-22, 28-30.] However, the Court agrees with the Commission that, if true, the alleged false attestations and statements Zouvas made to FINRA, the brokerage firm and to the transfer agent are connected to the sale of securities because they touched upon or had some nexus with a securities transaction. *Charnay,* 537 F.2d at 350 (clauses (a) and (c) are "are flat prohibitions of deceitful practices and market manipulations.") The fact that Zouvas' statements were not disseminated directly to investors does not foreclose liability. *Naftalin,* 441 U.S. at 772 ("the statutory language does not require that the victim of the fraud be an investor - only that the fraud occur 'in' an offer or sale."); *SEC v. Czarnik*, No. 10 Civ. 745(PKC), 2010 WL 4860678 (S.D.N.Y. Nov. 29, 2010).

If true, Zouvas made false attestations to the brokerage firm which facilitated Jorgenson and Schiprett being able to deposit and then sell Crown's shares in the market. *Naftalin,* 441 U.S. at 773 (elements are to be interpreted broadly so as "to encompass the entire selling process.") Similarly, the alleged false information that Zouvas gave to FINRA, the organization relied on by investors to ensure that the information they receive is truthful and complete, pertaining to the ownership of over 50% of Crown's issued and outstanding stock further enabled the stock to be publicly traded and legitimized Crown as a genuine business and investment opportunity. [*Id.* ¶¶ 31, 32.] *See, e.g., SEC v. Hasho,* 784 F. Supp. 1059 (S.D.N.Y 1992) ("any statement that is reasonably calculated to influence the average investor satisfies the 'in connection with' requirement of Rule 10b-5."); *SEC v. C. Jones & Co.,* 312 F. Supp. 2d 1375, 1381-82 (D. Colo. 2004) ("false

---

dismiss); *SEC v. Joseph Schlitz Brewing Co*., 452 F. Supp. 824, 829 (E.D. Wis. 1978) (material omissions from press releases and SEC filings satisfied connection requirement because reasonable investor might rely thereon and information is calculated to influence investors); *SEC v. General Refractories Co*., 400 F. Supp. 1248, 1257 (D.D.C. 1975) (material omissions from annual reports, proxy statements and 13 D Schedules satisfied connection requirement because investors might have based investment decisions upon documents).

allegations to NASD that enabled a stock to be publicly traded are reasonably calculated to influence the investing public and hence made in connection with the purchase or sale of a security.").

Likewise, if true, Zouvas' alleged false statements and attestations to Crown's transfer agent, enabled the stock to be publicly traded and were, therefore, sufficiently connected to subsequent securities transactions. *Rana Research*, 8 F.3d at 1362 (a fraud that touches "the intrinsic value of securities and the means of accomplishing the purchase of securities is sufficiently connected with securities transactions to bring the fraud within Section 10(b).") *See also McGann v. Ernst & Young,* 102 F.3d 390, 397 (9th Cir. 1996) ("[a]ny person or entity, including a lawyer, accountant, or bank . . . may be liable as a primary violator under 10b-5…") (quoting *Central Bank,* 511 U.S. at 191).

Additionally, the Court does not find Zouvas's argument regarding the materiality of his attestations to the transfer agent persuasive.  Firstly, materiality need only be established in the case of a misrepresentation or omission violation alleged under Rule 10b-5(b).  *Charnay*, 537 F.2d at 350-351.  Zouvas does not need to have made a materially false statement, he need only to have made an intentionally deceptive contribution to an overall scheme.  *SEC v. Berry,* 580 F. Supp. 2d 911, 923 (N.D. Cal. 2008)*; Hasho,* 740 F. Supp. at 1106; *SEC v. Currency Trading Intern., Inc.*, No. CV02-05143PA, 2004 WL 2753128, at *6 (C.D. Cal. Feb 2, 2004).  Secondly, even if the Commission had to prove the materiality of Zouvas' attestation "[d]etermining materiality in securities fraud cases "should ordinarily be left to the trier of fact." *Phan,* 500 F.3d at 908 (quoting *In re Apple Computer Secs. Litig.,* 886 F.2d 1109, 1113 (9th Cir. 1989)).  *See also Fecht,* 70 F.3d at 1080-81 (materiality is a fact-specific inquiry, and typically a jury question).

The Court finds that Commission has sufficiently pled that Zouvas' alleged fraudulent conduct touches upon Crown's securities transactions to meet the in connection requirement. *Rana Research,* 8 F.3d at 1362.

16

3:16-cv-0998-CAB-(DHB)

### 3. Scienter Adequately Alleged

Zouvas' argues that the Commission has failed to adequately plead scienter under either a knowledge or recklessness theory. [Doc. No. 18-1 pgs 22-25.]

To establish a claim under Section 10(b) and Rule 10b-5 requires the Commission prove that Defendants acted with scienter. *Ernst*, 425 U.S. at 193; *Phan*, 500 F.3d at 908. The Ninth Circuit has established that scienter "requires either 'deliberate recklessness' or 'conscious recklessness,' and that it includes a 'subjective inquiry' turning on 'the defendant's actual state of mind." *SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1093 (9th Cir. 2010) (citation omitted). *See also Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990). To be reckless, conduct must be "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must be aware of it." *Hollinger,* 914 F.2d at 1569. However, unlike a private action, which requires a plaintiff to plead facts giving rise to a strong inference of scienter, the Commission "may allege the scienter element of a securities fraud claim generally." *Berry,* 580 F. Supp. 2d at 921.[11]

Here, the complaint is replete with general allegations regarding Zouvas' scienter. [*See, e.g.,* Doc. No. 1. at ¶¶ 23, 35, 36, 41, 61, 65, 75, 77, 80, 83, 86.] Thus, accepting the allegations as true, and construing them in the light most favorable to the Commission, the Court finds the complaint plausibly supports a finding of scienter as to Zouvas. *See generally, Iqbal,* 129 S. Ct at 1949. Moreover, the Commission has sufficiently alleged facts that Zouvas, in his role as general counsel at Crown, intentionally or recklessly made

---

[11] *See also, U. S. ex rel. Matheny v. Medco Health Solutions, Inc*., 671 F.3d 1217, 1223 (11th Cir. 2012) (noting that although a private action under the False Claims Act must meet the heightened pleading standard of Rule 9(b) when alleging the mechanics of the fraud, the complaint may generally plead the scienter portion of the fraud allegations); *SEC v. Med. Capital Holdings, Inc.,* No. SACV 9-0818 DOC (RNBx), 2010 WL 809406, at *3 (C.D. Cal. Feb. 24, 2010); *Levin,* 232 F.R.D. at 623; *SEC v. ICN Pharm., Inc.,* 84 F. Supp. 2d 1097, 1098–99 (C.D. Cal. 2000).

statements to the brokerage firm and transfer agent regarding the lawfulness of multiple transferring purchases were misleading when made. Similarly, the complaint clearly alleges Zouvas knew or was reckless in not knowing, that Crown's public statements regarding its' securities ownership along with the statement Zouvas made to FINRA, were materially false and misleading.

Accordingly, the Court concludes that the Commission has met is burden and denies Zouvas' motion to dismiss the Commissions claims on the basis that it has inadequately pleaded scienter.

### 4. Proof of Reliance Not Necessary

Zouvas argues that the Commission failed to establish a violation of the Securities Acts because it has failed to show any purchase or sale of securities in reliance of the alleged misrepresentations. [Doc. 18-1 pg. 29-30.] Zouvas misstates the Commission's burden. As the primary enforcement agency for the securities laws, the Commission does not have to demonstrate reliance when bringing actions for injunctive relief under Section 10(b) and Rule 10b-5. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 751 n. 14 (1975) ("the purchaser-seller rule imposes no limitation on the standing of the SEC to bring actions for injunctive relief under § 10(b) and Rule 10b-5."); *Rana Research*, 8 F.3d at 1363-64 ("Reliance is not an element of a Rule 10b-5 violation by misrepresentation; rather, it is an element of a private cause of action for damages implied thereunder. The SEC need not prove reliance in its action for injunctive relief on the basis of violations of Section 10(b) and Rule 10b-5.")

### 5. Conclusion Regarding Section 10(b) and Rule 10b-5 Claims

Here, the allegations in the complaint provide a detailed explanation, spanning over sixteen pages, how the scheme to defraud was carried out. The Commission has described each of the defendants' role in the scheme in sufficient detail, including who was involved and what each individual did. The overall scheme, as alleged, was deceptive, and the allegations in the complaint sufficiently allege Zouvas committed actions with the purpose and effect of creating a false appearance in furtherance of the scheme to defraud. Thus,

the court concludes that the Commission has adequately pled Zouvas' "intentionally deceptive contribution to an overall fraudulent scheme" to survive a motion to dismiss. *Berry*, 580 F. Supp. 2d at 923.

### C. Scheme to Defraud Under Sections 17(a)(1) and 17(a)(3)

Zouvas' final argument in support of dismissal is that the Section 17(a) charge against him is inappropriate because the complaint hasn't alleged that he was seller, therefore he is exempt from the statute. [Doc. No. 18-1 pg 30-31.]

 "Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5, prohibit fraudulent conduct or practices in connection with the offer or sale of securities." *SEC v. GLT Pain Rauscher, Inc.*, 254 F.3d 852, 855 (9th Cir. 2001). Under Section 17(a) it is unlawful in the offer or sale of securities "(1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C § 77q(a).

To establish a claim under Section 17(a)(1) requires the Commission prove that Defendants acted with scienter whereas Section 17(a)(3) only requires a showing of negligence. *Phan*, 500 F.3d at 908. "The same elements required to establish a Section 10(b) and Rule 10b-5 violation suffice to establish a violation under Sections 17(a)(1)-(3)." *See e.g., Czarnik,* 2010 WL 4860678, at * 3.

Contrary to his assertion that the Commission has not alleged that he was a seller, the complaint alleges that "between September 27 and October 7, 2013, Zouvas sold all of the 87,500 Crown shares he purportedly acquired for proceeds of approximately $10,300. [Doc. No. 1 at ¶ 62.] In light of this, Zouvas' argument surrounding the Supreme Court's opinion in *Aaron v. SEC,* 446 U.S. 680, 687 (1980) limiting application of "Section 17(a)

applies only to sellers" is confusing at best.[12]  Additionally, Zouvas makes similar arguments in support of dismissing the Section 17(a) claims to those he made surrounding the Rule 10b-5 and Section 10(b) claims. [Doc. No. 18-1, pgs. 20-31.]  For the same reasons the Court declined to dismiss the Section 10(b) and Rule 10b-5 claims, it declines to dismiss the Section 17(a) claims.  *See e.g., Czarnik,* 2010 WL 4860678, at * 3.

## V. CONCLUSION

In light of the above, Zouvas motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Procedure is therefore **DENIED**.

**IT IS SO ORDERED.**

Dated:  November 21, 2016

_____
Hon. Cathy Ann Bencivengo
United States District Judge

---

[12] Similar arguments have been put forth by other defendants and rejected by other courts.  *See, e.g., Czarnik,* 2010 WL 4860678, at * 3 (the phrase from *Aaron* cannot be read in isolation and, when placed in context, "appears to have been intended to draw a distinction between Section 17(a)'s applicability to 'sellers' and Section 10(b)'s applicability to 'both buyers and sellers,' and not as a limitation on the reach of Section 17(a)."). *See also SEC v. Wolfson*, 539 F.3d 1249, 1263-64, 1264 n. 20 (10th Cir. 2008) (the *Aaron* opinion "does nothing to strictly limit § 17(a) liability *only to* the literal buyers and sellers of securities.") (emphasis in original); *SEC v. Holschuh,* 694 F.2d 130, 142 (7th Cir. 1982) ("[A]ctual first-hand contact with offerees or buyers [is not] a condition precedent to primary liability for antifraud violations.")